## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **JILL ANN ROGERS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 23-2143-JAR** |
| **UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS,  as representative of Kansas City Board of Public Utilities,** | |
| **Defendant.** | |

### MEMORANDUM AND ORDER

Plaintiff Jill Ann Rogers brings this action against her former employer, Defendant Unified Government of Wyandotte County/Kansas City, Kansas, as representative of the Kansas City Board of Public Utilities ("BPU"), alleging failure-to-accommodate, discrimination and harassment/hostile work environment claims under the Americans with Disabilities Act ("ADA").[1], as amended.  Before the Court is Defendant's Motion for Summary Judgment (Doc. 39).  The motion is fully briefed, and the Court is prepared to rule.  For the reasons set forth in detail below, the Court grants the motion.

### I.     Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in

---

[1] 42 U.S.C. § 12101, *et seq.*

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the non-moving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."[11]  The non-moving party cannot avoid

---

[3] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro.  Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[8] *Anderson*, 477 U.S. at 256.

[9] *Id.*

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[11] *Adams v. Am. Guar. & Liab.  Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[12]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[13]

## II.   Facts

The following facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.  In determining these facts, the Court has considered and ruled upon all evidentiary objections raised by the parties in their briefs.

Plaintiff began working for the BPU in 2003.  In 2013 she was promoted to Assistant Purchasing Agent.  In 2016, Plaintiff was diagnosed with multiple sclerosis ("MS").  Plaintiff's supervisor, Lori Austin, was aware of Plaintiff's MS and daily observed her mobility issues.

In 2019, Plaintiff requested that BPU install an automatic door at the building entrance and a push button for the restroom door.  BPU installed the modifications.  Thereafter, Plaintiff complained that the restroom door was difficult to operate and that the entrance door would not always open with her access card.  At times, Plaintiff suffered continence accidents causing her embarrassment and the need to change her clothes.  Other employees also complained about the entrance door.

After she was diagnosed with MS, Plaintiff requested a designated parking space that provided easier access to the building.  Between 2016 and 2020, at Plaintiff's request, BPU moved Plaintiff's parking space five times.  Parking spaces were changed either because the

---

[12] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[13] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

space was on an incline; or was subjected to ice, rain, or snow; or had been assigned to a board member who complained about losing the space; or the space was reliant upon access to elevators that at times malfunctioned.  But the parking issues were resolved in 2020, when BPU assigned to Plaintiff a suitable reserved parking space in a spot closest to the building's employee entrance.  Plaintiff did not request it, but BPU also removed six inches of a concrete curb in its parking garage to increase mobility for Plaintiff's scooter.  And in 2019, although Plaintiff did not request it, BPU purchased an electric scooter for Plaintiff's use at work; a BPU employee daily assisted Plaintiff with her physical transition between the scooter and her vehicle. In March 2020, BPU did not timely respond to Plaintiff's notice that the scooter battery was low. BPU replaced the battery after it died, which caused Plaintiff to miss work for several days.

In 2017, after Purchasing Director Cherryl Johnson retired, Plaintiff was named Acting Purchasing Director, and continued to also serve as Assistant Purchasing Agent.[14]  Plaintiff received a 5% step-up in pay and served in the dual role of Acting Purchase Director/Assistant Purchasing Agent for four years.  Plaintiff reported to Lori Austin, the Chief Financial Officer and Chief Administrative Officer, whose duties included oversight of the Purchasing and Human Resources departments.  From 2018 to 2020, Plaintiff complained to Austin that holding these two positions caused her stress and flare-ups in her MS and asked for help.  Austin responded that she was unable to hire any non-essential personnel during COVID.

In 2019, Austin emailed or spoke in person to Plaintiff about her not being at her desk in the afternoons.  On August 5, 2019, Plaintiff sent an email to Austin, explaining that on Mondays and Wednesdays she worked from 6:30 to 2:30, because she had a standing physical therapy

---

[14] There is some discrepancy in the record regarding Plaintiff's job title during this time period, but it does not affect the Court's ruling on Plaintiff's failure-to-promote claim.

appointment at 3 pm on those days, and that she usually left the office for lunch.  Plaintiff further

explained that on the other days of the week, she worked from 6:30 and stayed until the work

was complete.[15]  Austin responded to the email that a couple of times on Friday it looked like

Plaintiff had been gone for the day.[16]  After this email exchange in 2019, about once every two to

three weeks, Austin made rude comments to Plaintiff about her work hours.  Plaintiff never

complained to anyone about Austin's comments, including HR, because the HR department

reported to Austin.[17]

     In November 2020, a job announcement for the Director of Purchasing and Supply Chain

position was posted.  The position required a bachelor's degree in management, procurement,

finance, or a business-related degree; a master's degree or MBA was considered a "plus."

Functional competencies included: (1) a minimum of ten years of experience in purchasing and

supply chain; (2) preferred experience with governmental or quasi-governmental entities; (3)

experience with bidding process for major construction projects; (4) experience with requests for

proposals and master service agreements; and (4) excellent negotiation skills.[18]

     Austin encouraged Plaintiff to apply for the position.  Two other members of Plaintiff's

department also applied.  BPU engaged an outside agency, Robert Half, to assist in screening

applicants for the position.  It was not atypical for BPU to engage outside agencies for job

searches involving high-level professional positions such as Director of Purchasing.[19]  Robert

Half only recommended interviewing two external candidates.  Austin and Dennis Dumovich,

---

[15] Doc. 40-19.

[16] *Id.*

[17] Rogers Dep., Doc. 40-2 at 147:1–17.

[18] Doc. 40-7.

[19] Austin Dep., Doc. 40-4 at 109:2–9.

the Director of Human Relations, decided to interview Plaintiff as well,[20] because she met the minimal qualifications.[21]

Austin and Dumovich interviewed Plaintiff in January 2021.  Austin and Dumovich ranked the external candidates higher than Plaintiff, and in February decided to hire Becky Aldinger, an external candidate.[22]

Aldinger's experience included eight years as Senior Procurement Manager at Kiewit and a long career in supply chain and procurement with other utilities and electricity companies including Kiewit and Westar.  She had managed teams of twenty individuals, had managed all procurement-related activities for contracts for power delivery and power generation projects, and had directly negotiated contracts, including construction contracts.  Aldinger had experience in purchasing the types of equipment and materials that BPU procured and experience in a much more professional process than BPU had utilized.[23]  During COVID, BPU had experienced tremendous supply chain and resource problems, particularly with procuring wire, cable and electric transformers.[24]  Aldinger had more vendor knowledge and vendor base than BPU had.  Plaintiff did not work with supply chain issues resulting from the pandemic.[25]  Aldinger, unlike Plaintiff, also had a master's degree.[26]

Plaintiff's experience as Assistant Purchasing Agent included "being responsible for the procurement of materials, supplies, services, equipment, tools," and "fulfilling the duties of the

---

[20] *Id.* at 78:7–80:9.

[21] Dumovich Dep., Doc. 40-5 at 20:10–25.

[22] Rogers Dep., Doc. 40-2 at 88:13–18.

[23] Doc. 40-8.

[24] Dumovich Dep., Doc. 40-5 at 42:8–20.

[25] Austin Dep., Doc. 40-4 at 110:10–13.

[26] Dumovich Dep., Doc. 40-5 at 23:3–23.

Purchasing Manager in his/her absence."[27]  Her experience as Acting Purchasing Director included "negotiating prices and contracts," "purchase orders," "execution of contracts," and "seeking reliable vendors or suppliers."[28]  As Assistant Purchasing Agent, Plaintiff was responsible for contract negotiations and purchasing for one storeroom; as Acting Purchasing Director, she was responsible for all the storerooms.

During the four years that Plaintiff worked as Acting Purchasing Director/Assistant Purchasing Agent, Austin reviewed Plaintiff's performance and assessed her as "Meeting Standards and Expectations."[29]  None of Plaintiff's evaluations in 2017, 2018, and 2019 indicated that she needed improvement with respect to contract negotiations, communicating with storerooms, or supply chain management.

After Cherryl Johnson's tenure as Purchasing Director and while Plaintiff served as Acting Purchasing Director, Austin endeavored to improve the purchasing department which had not taken a sufficiently active role in contract negotiations and substantive contract review. Austin considered the department as operating as a "pass-through of paper."[30]  Austin saw some improvement during Plaintiff's tenure, but thought Plaintiff was not spending sufficient time doing substantive reviews of contracts.[31]  Based on BPU's records, between August 13, 2019, and March 4, 2021, while Plaintiff served as Acting Purchasing Director, she spent less than one minute reviewing 29% of the relevant contracts and less than five minutes reviewing 36.4% of the contracts.[32]

---

[27] Doc. 55-11.

[28] *Id.*

[29] Rogers Dep., Doc. 40-2 at 47:4–25, 48:11–21, 48:24–49:15, 51:4–9; Doc. 55-6; Doc. 55-7; Doc. 55-8.

[30] Austin Dep., Doc. 40-4 at 45:3–24.

[31] *Id.* at 46:16–47:1.

[32] Doc. 58-6.

BPU has no written policy prohibiting remote work.  Before COVID, BPU did not allow employees to work remotely.  Plaintiff recalls an employee who was a cancer patient being allowed to work remotely for over a month, but she doesn't recall the name of the person, nor the time period.[33]  Before COVID, Plaintiff began receiving chemotherapy treatments for her MS once every six months.  Plaintiff would get the chemotherapy treatment on a Friday and be on sick leave for the next work week.[34]

During the first three weeks of the COVID-19 pandemic in 2020, BPU allowed some employees to work remotely from home for three weeks.  After the initial three weeks, all employees were required to return to work in the workplace.  Employees were allowed to work remotely from home during any period in which they were required to be quarantined because of COVID.  But these periods of remote work were limited in time to approximately a week.[35]

Plaintiff's chemotherapy treatments compromised her immune system.  In the summer of 2020, during the COVID-19 pandemic, BPU allowed Plaintiff to work remotely for three to four weeks to avoid COVID-19 exposure around the time of her biannual chemotherapy treatment.[36]

Plaintiff's next chemotherapy treatment was scheduled for February 18, 2021.  In January 2021, Plaintiff's physician advised her that she could not yet receive the COVID vaccine because of her medical issues and that she should stay home for three weeks before the February 18 chemotherapy session to avoid COVID-19 exposure and stay home for a few weeks after the chemotherapy session as well.  Plaintiff requested to work from home before and after her chemotherapy treatment in February, and BPU granted this request.  Plaintiff began working

---

[33] Rogers Dep., Doc. 40-2 at 131:2–23.

[34] *Id.* at 128:1–6.

[35] Dumovich Dep., Doc. 40-5 at 14:7–15:7; Swartz Dep., Doc. 40-9 at 21:2–9.

[36] Rogers Dep., Doc. 40-2 at 44:19–45:8.

remotely from home in February and claimed only two sick days the month of February, on Monday, February 15 and Thursday, February 18—the day of her treatment.[37]

In February, sometime before her chemotherapy treatment on February 18, Austin and Dumovich informed Plaintiff that they had decided to hire Becky Aldinger as Director of Purchasing and Supply Chain.[38]  They asked Plaintiff when she planned to return onsite after her chemotherapy treatment and advised her that they wanted her to assist with onboarding or training Aldinger.  Plaintiff responded that she had not had her treatment yet and did not know when she would return.[39]  Plaintiff expressed concern about having to sit next to Aldinger, in close proximity, in order to train her.[40]  Austin and Dumovich did not respond that Plaintiff would have to sit in close proximity to Aldinger.[41]  Plaintiff, Aldinger and Dumovich had no further conversation about Plaintiff's concerns.

On February 17, the day before her chemotherapy treatment, Plaintiff sent an email to HR employee Dustin Swartz stating: "I have been instructed by my doctor to work at home."[42]  She attached to this email a February 11, 2021 letter from her medical provider, Doug Schell, stating: "Because of her increased risk of infection I recommend that she work from home to decrease her exposure to bacteria and viruses, decrease her risk of infection, especially during the current COVID-19 pandemic situation."[43]  BPU granted this request and Plaintiff continued to work

---

[37] Doc. 55-20.

[38] Rogers Dep., Doc. 40-2 at 88:13–18.

[39] *Id.*

[40] *Id.* at 101:18–21.

[41] *Id.* at 103:8–12.

[42] Doc. 40-11.

[43] Doc. 40-10.

from home during the entire month of February 2021, before and after her chemotherapy treatment.[44]

Around March 2, 2021, Swartz asked Plaintiff when she would be returning to work in person, because Austin and Dumovich wanted to coordinate her return with Aldinger's start date.[45]  Plaintiff asked Swartz what Aldinger's vaccination status was; Swartz responded that he could not share this private information.[46]  Swartz further advised Plaintiff that Austin required that Plaintiff have a doctor's note clearing her to return to work in the workplace.[47]

At some point in March, and prior to March 25, Plaintiff advised that her doctor would not provide a note clearing her to return to the workplace,[48] and Plaintiff asked Swartz if she could work remotely from home for some indefinite period.  Swartz responded that BPU did not allow remote work for an indefinite period.[49]  Plaintiff and Swartz discussed what Plaintiff's options were if she could not return to work onsite.  Swartz advised Plaintiff that she could take 12 weeks of FMLA and thereafter she could take long-term disability and her job would be preserved for two years.[50]  Plaintiff then took 12 weeks of FMLA leave from March 5 to May 11, 2021.[51]

On March 25, 2021, while she was on FMLA leave, Plaintiff provided another letter from her medical provider that stated: "For medical reasons, Ms. Rogers will not be returning to work

---

[44] *See* Doc. 55-20.

[45] Rogers Dep., Doc. 40-2 at 88:19–89:2, 107:9–22, 106:3–-2.

[46] *Id.* at 110:19–111:14.

[47] *Id.* at 43:2-9.

[48] *Id.* at 108:5–13, 109:22–110:1.

[49] *Id.* at 47:2–21.

[50] *Id.* at 45:12–24.

[51] Doc. 55-20.

at this time for an indefinite period."[52]  Swartz interpreted this note to mean Plaintiff would not be returning to work at all for an indefinite period of time, either remotely or in person.[53]  At some point before her FMLA leave expired on May 11, Plaintiff had another conversation with BPU about her status.[54] Plaintiff was again advised that indefinite remote work was not an option.  Plaintiff commenced long-term disability in June 2021.[55]

More than a year after she took FMLA leave, and about nine months after she went on long-term disability, on March 31, 2022, Plaintiff attempted to email another note from her medical provider to Dumovich.  This note stated: "Due to her medical treatment Ms. Rogers has a compromised immune system and is at increased risk of infection.  Because of this we support her working remotely/working from home rather than working in the office.  This will limit her exposure to possible infection."[56]  But Dumovich did not receive this email from Plaintiff because she inadvertently sent it to the email address of Daniel Dumovich, another BPU employee, despite Plaintiff having sent past emails to the correct address for Dennis Dumovich.[57] This March 31, 2022 email did not come to light until BPU deposed Plaintiff in 2023.[58]

On November 22, 2021, Plaintiff filed a Kansas Human Rights Commission Charge of Discrimination ("original Charge"), by dictating to an EEOC employee over the phone.[59]   In the narrative description of her Charge, Plaintiff stated:

---

[52] Doc. 40-12.

[53] Swartz Dep., Doc. 40-9 at 58:4–24.

[54] It is unclear from the record whether Plaintiff talked to Swartz, who left BPU's employ at some time during this period, or whether she talked to Dumovich or some other BPU employee.

[55] Rogers Dep., Doc. 40-2 at 93:4–23, 113:17–114:5.

[56] Doc. 40-12; 40-13.

[57] Dumovich Dep., Doc. 40-5 at 27:14–16.

[58] Doc. 40-13.

[59] Doc. 40-16.

I was hired by the Board of Public Utilities (BPU) in June 2003 and remained employed as an Assistant Purchasing agent up until March 9, 2021, at which time I went out on FMLA leave.  Under my employer's guidelines, FMLA protects me for 2 years (until I reached retirement, according to HR).  Instead, I was forced to go out on Long Term Disability (LTD) because BPU failed to accommodate me by providing extended FMLA.  Im [sic] on FMLA, but feel I was forced out on LTD due to BPU's request for a return to work note due ongoing treatment(s) for my medical condition.

In May of 2016, I was diagnosed with a condition that limits my mobility.  I needed to use handicap parking stalls and requested installation of automatic doors that open upon approach.  BPU installed the automatic doors but they constantly malfunctioned and work orders to repair them often went ignored.  The employee handicap stalls at BPU were not close to the main entrance, so it was not convenient for someone with mobility issues.  There are handicap stalls near the main entrance but those were reserved Directors and Board members.  At one point, I had been given permission to park in the handicap stalls closest to the main entrance but lost the privilege after a Board member complained.  There are no handicap stalls at employee entrances near the elevator and even though there is space that could be designated as such, those stalls are reserved for Board Members and upper management and BPU won't designate those as handicap stalls for everyone to use.

Before going out on LTD, I served as Acting Purchasing Director for 3 years and was under the impression Id [sic] be promoted to Purchasing Director.  Around March 2, 2021, I learned I did not get the promotion but instead was required to train the new hire on a position I had done for 3 years without problems.  Due to being immunosuppressed, I had concerns about being in close proximity with another employee, so I asked about their vaccination status.  I was never made aware of the new hires [sic] vaccination status and was told I should just stay home to avoid getting ill.  Eventually, BPU required me to get a doctors [sic] note to return to work, something I had not been required to do for 3 years while undergoing medical treatments.  When I asked my doctor about the note, my doctor stated he was not comfortable with writing such a note as he believed BPU was trying to shift liability onto my doctor so I could not obtain a return to work note.  Because BPU as now required a return to work note and my doctor was not willing to provide me one, I felt compelled to go out on LTD until I could retire.  Since my doctor would not release me to return to

work on BPU's terms, I was told to stay at home on FMLA until future findings on Coronavirus.

I believe I have been discriminated, overlooked for a promotion and forced out on LTD into early retirement because of my disability, in violation of the Americans With Disabilities Act of 1990, as amended.[60]

Plaintiff filed an Amended Charge on April 19, 2022, which stated:

I was hired by the Board of Public Utilities (BPU) in June 2003 and remained employed as an Assistant Purchasing Agent up until March 9, 2021, at which time I went out on FMLA leave. BPU is an agency within the Unified Government of Wyandotte County, Kansas City, Kansas. Respondent represented to me that FMLA protects me for 2 years so there was discussion with HR about me remaining on FMLA for up to 2 years (until I reached retirement, according to HR) because of my disability. I was forced to go out on Long Term Disability (LTD) because respondents failed to accommodate me by allowing me to return to work in a remote capacity as requested by my medical providers.

The specifics of my disability are as follows: In May of 2016, I was diagnosed with MS which limits my mobility. During my employment I required handicap parking stalls and requested installation of automatic doors that open upon approach. Respondent installed the automatic doors but they constantly malfunctioned and work orders to repair them often went ignored. The employee handicap stalls were not close to the main entrance, so it was not convenient for someone with mobility issues. There are handicap stalls near the employee entrance but those were reserved for management and Board members. At one point, I had been given permission to park in the handicap stalls closest to the main entrance but lost the privilege after a Board member complained. There are no handicaps stalls at employee entrances near the elevator and even though there is space that could be designated as such, those stalls are reserved for Board Members and upper management. Respondent won't designate those as handicap stalls for everyone to use.

Before going out on LTD in June of 2021, I served as Acting Purchasing Director for 3 years and was led to believe that I'd be promoted to Purchasing Director. Around March 2, 2021, I learned that I did not get the promotion. An individual from

---

[60] *Id.*

outside the County was hired and I was required to train the new hire.  Due to being immunosuppressed, as a result of the chemotherapy treatments I receive for MS, I and my medical providers had concern about me being in an office setting and in close proximity with another employee.  I asked about the vaccination status of the new employee who I was to sit next to and train.  I was never made aware of the new hire's vaccination status, yet they still wanted me to sit next to her and train her.  Since my medical providers were not comfortable with this in person training arrangement, respondent told me I should just stay home to avoid getting ill.  Eventually, respondent required me to get a doctors note to return to work, something I had not been required to do for 3 years while undergoing medical treatments for my MS.  Over the past 3 years I was permitted to work remotely as needed to accommodate my chemotherapy treatments for my MS.  When I informed my doctor that respondent wanted me to return to work in person and wanted a note stating that I could return to an office setting, my doctor stated he was not comfortable with writing such a note because of my disability and resulting compromised immune system from the chemotherapy treatment.

Because respondent was requiring a doctor's note stating that I could return to work in the office, which my doctor was not willing to allow, and respondent was refusing me the accommodation of a remote work arrangement, I was compelled to go out on LTD.  Since my doctor would not release me to return to work in an office setting, and because respondent would not provide the accommodation of remote working, I was told by respondent to stay home.

I have been discriminated against based on my disability of MS.  I have been denied a promotion because of my disability, refused the reasonable accommodation of a remote working arrangement, denied handicap access to buildings and parking, and was forced onto LTD because of my disability and respondent's failure to provide reasonable accommodations.  As a result of respondent's conduct, I have incurred and will continue to incur lost wages and benefits.  I have also experienced and continue to experience emotional distress.[61]

---

[61] Doc. 40-17.

### III.     Discussion

The Pretrial Order sets out Plaintiff's claims of "disability discrimination and harassment," and specifically states this occurred through BPU: (1) failing to provide reliable accessibility to parking and facilities; (2) failing to reasonably accommodate her repeated requests for such access; (3) engaging in ongoing discriminatory and harassing behavior that was sufficiently severe and pervasive that it interfered with the terms, conditions, and privileges of employment; (4) failing to promote her to Purchasing Director; and (5) failing to reasonably accommodate her  request to work remotely during and after March 2021.[62]  Although failure to accommodate is a separate and distinct claim from discrimination or harassment, Plaintiff seems to claim that BPU's failure to give her reasonable access to accessible parking and the building was both harassment as well as a failure to accommodate her disability.[63]

As Judge Mitchell noted in the Pretrial Order, Plaintiff's Complaint is "not a model of clarity as to precisely what types of ADA claims she is asserting."[64]  For purposes of summary judgment, the Court assumes that Plaintiff is alleging that BPU's failure to give her reasonable access to the building constituted both harassment and a failure to accommodate.  The Court proceeds to consider below all three of Plaintiff's claims: harassment, failure-to-accommodate, and discrimination, including whether Plaintiff sufficiently and timely administratively exhausted her claims.

---

[62] Doc. 38.

[63] In the Pretrial Order, Plaintiff frames this as a failure-to-accommodate claim, but in her response to the motion for summary judgment, she frames it as part of the discriminatory harassment she suffered in the workplace.

[64] Doc. 38 at 11.

A.      Harassment

Plaintiff first claims that she was subjected to harassment that was severe and pervasive and interfered with the terms, conditions, and privileges of her employment in two respects: (1) BPU's failure to accommodate her with reliable and reasonable access to parking and facilities; and (2) being subjected to rude comments from her supervisor Lori Austin.

Both the original and amended EEOC charges state in detail that BPU failed to adequately address Plaintiff's problems with access to facilities.  BPU installed automatic doors that frequently malfunctioned and BPU failed to provide her with reasonably accessible parking despite her repeated complaints and requests.

The ADA requires a plaintiff to exhaust her administrative remedies by filing a charge with the EEOC within 300 days of the alleged discrimination.[65]  A plaintiff's failure to exhaust administrative remedies is no longer a jurisdictional bar to suit, but instead "permits a defendant only an affirmative defense."[66]  The defendant has the burden of proof on the affirmative defense, and in moving for summary judgment, "[t]he defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[67]  Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact.  If the plaintiff fails to make such a showing, the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment

---

[65] 42 U.S.C. § 12117(a) (incorporating Title VII's enforcement provisions (found in 42 U.S.C. § 2000e-5) into the ADA); 29 U.S.C. § 626(d)(1).  "The 300 day limitation applies in those states that have statutorily prohibited discrimination," such as Kansas.  *Sloan v. Boeing Co.*, No. 95-3354, 1997 WL 8868, at *2 & n.4 (10th Cir. Jan. 19, 1997) (citation omitted).  Otherwise the limit is 180 days.  *Id.* (citation omitted).

[66] *Brown v. Keystone Learning Servs.*, 804 F. App'x 873, 882 (10th Cir. 2020) (citing *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1183 (10th Cir. 2018)).

[67] *Hutchinson v. Pfeil,* 105 F.3d 562, 564 (10th Cir. 1997) (citations omitted).

as a matter of law."[68]  Each discrete failure to accommodate must be exhausted.[69]  Although courts liberally construe a plaintiff's allegations in an EEOC charge, the charge must contain facts concerning the discriminatory actions underlying each claim.  "[T]he ultimate question is whether the conduct alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge]."[70]

Neither in her EEOC Charge filed on November 22, 2021, nor in her Amended Charge filed on April 19, 2022, did Plaintiff allege anything about harassment or a hostile work environment.  In the original and amended charges, Plaintiff details BPU's repeated failure to provide her a reasonably accessible parking space, and that the automatic doors to the building repeatedly malfunctioned.  But neither charge styles this as harassment.  At best, the charge alleged sufficient facts to trigger an EEOC investigation into access and accommodation of her needs for parking and building access.  But the charge certainly would not have triggered an investigation into BPU employees intentionally harassing Plaintiff through failing to provide appropriate parking or consistently functioning doors.  Indeed, Plaintiff does not allege that BPU's failures were based on intentional, harassing conduct. In fact, failure to accommodate is a discrete act that does *not* fall within a hostile work environment claim.[71]

Moreover, even if the problems with accessibility could constitute harassment, these problems occurred outside the 300-day deadline to file an administrative claim.  Because

---

[68] *Id.*

[69] *Goodson v. DeJoy*, No. 22-1338, 2023 WL 4782947, at *5 (10th Cir. July 27, 2023) (citation omitted).

[70] *Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410, 1416 n.7 (10th Cir. 1993), *overruled on other grounds as recognized by Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1185 (10th Cir. 2003) (second and third alterations in original).

[71] *Johnson v. Norton Cnty. Hosp.*, 550 F. Supp. 3d 937, 957 (D. Kan. 2021).

Plaintiff did not file an EEOC charge until November 22, 2021, acts occurring before January 26, 2021 are outside of the 300-day window. It is undisputed that although BPU moved Plaintiff to five different parking spaces based on her complaints, by 2020 BPU provided Plaintiff with a suitably accessible parking space. The parking issues were resolved before January 26, 2021. And Plaintiff has failed to point to any evidence that the problems with the automatic doors persisted after January 26, 2021.

Plaintiff further claims that she suffered discriminatory harassment by Austin, who made rude comments to her about her work hours in 2019 and continued to make such comments once every two or three weeks thereafter. This is not mentioned in either the original or amended EEOC charge. And neither charge stated anything that would have given adequate notice triggering an EEOC investigation into Austin's conduct.[72] For this reason, Plaintiff's claim of harassment by Austin is also not administratively exhausted.[73]

In short, BPU has met its burden of proof on this affirmative defense of failure to exhaust; there is no disputed material fact about Plaintiff's failure to give the requisite notice in her EEOC charge(s) to render her harassment claim exhausted. Summary judgment is granted on the claim of harassment for failure to sufficiently and timely administratively exhaust her claim.

### B. Failure-to-Accommodate Claims

Plaintiff alleges that Defendant failed to reasonably accommodate her disability in two ways: (1) by failing to provide her with access to parking and building facilities; and (2) by failing

---

[72] In fact, the Pretrial Order also fails to state that Plaintiff claims that Austin harassed her.

[73] Furthermore, the conduct Plaintiff complains about, that Austin made remarks about Plaintiff's work hours once every two to three weeks does not rise to the level of severe and pervasive harassment. *See, e.g.*, *Morris v. City of Colo. Springs*, 666 F.3d 654, 666 (10th Cir. 2012) (stating that a pervasively hostile work environment requires a "steady barrage of opprobrious . . . comments" (citation omitted)).

to allow her to work remotely.  Defendant moves for summary judgment on both claims based on failure to administratively exhaust, and on the merits.  The Court addresses each in turn.

### 1.    Administrative Exhaustion

#### a.    Access to Building and Parking Facilities

Both the original and amended charges detail Plaintiff's claim that BPU failed to accommodate her by providing reliable and reasonable access to parking and the BPU building. The charge describes malfunctioning automatic doors that were not always quickly repaired, causing her to have urinary accidents when she could not access the restroom quickly enough. The employee handicap parking spaces were not close to the main entrance and not convenient for someone with mobility issues.  At Plaintiff's urging, BPU repeatedly changed her parking space, but every assigned parking space had accessibility issues.  The charge provided sufficient notice to trigger an EEOC investigation into BPU's failure to accommodate Plaintiff reasonable access.  However, the problems with access to parking were resolved in 2020, outside of the 300-day window for filing a timely charge.  And Plaintiff has failed to point to any evidence that the problems with the automatic doors malfunctioning continued after January 26, 2021. Accordingly, Plaintiff has failed to exhaust her claim that Defendant failed to accommodate her disability by denying her access to parking and building facilities.

#### b.    Indefinite Remote Work

In her original Charge, Plaintiff made no mention of a request to work remotely, but stated that "BPU failed to accommodate me by providing extended FMLA," and further stated that "[s]ince my doctor would not release me to return to work on BPU's terms, I was told to stay at home on FMLA until future findings on Coronavirus."[74]  In her Amended Charge, Plaintiff

---

[74] Doc. 40-16.

described how BPU required her to obtain a return-to-work note, which her doctor would not provide to her, which meant she was forced to go out on long-term disability because "because respondents failed to accommodate me by allowing me to return to work in a remote capacity as requested by my medical providers."[75]

Defendant argues that Plaintiff's claim that it failed to accommodate an indefinite remote work arrangement was not exhausted because it was not sufficiently described in the original Charge, and because it occurred in March 2021, outside of the 300-day-look-back period of the Amended Charge filed on April 19, 2022.[76]  But an amended charge will relate back to the filing date of the original charge and therefore be considered timely, if it (1) corrects technical defects or omissions; (2) clarifies or amplifies allegations made in the original charge; or (3) adds additional violations "related to or growing out of the subject matter of the original charge."[77]

Although Plaintiff did not expressly state in the original Charge that BPU failed to accommodate her request for remote work, she stated that she was forced to take long-term disability because BPU requested that she return to the office and provide a doctor's note clearing her to return, which the doctor refused to provide.  In her Amended Charge, Plaintiff provided more context and explanation, that she was seeking to return to work in a remote capacity as requested by her medical providers and that BPU refused to accommodate a remote working arrangement.  The Amended Charge served to clarify or amplify her the allegations in her original Charge that she was seeking a remote work arrangement.  The Amended Charge stated that Defendant refused to allow her to work remotely in March 2021 and beyond, which

---

[75] Doc. 40-17.

[76] The 300-day period for the original charge commenced on January 26, 2021 and the 300-day period on the amended charge commenced on June 23, 2021.

[77] 29 C.F.R. § 1601.12(b).

was a clarification of Plaintiff's language in the original Charge that the doctor would not release her to work "on BPU's terms."[78]  The Court concludes that Plaintiff's Amended Charge relates back to the original Charge filed on November 22, 2021, and thus this claim of failure to accommodate her request for remote work was exhausted.

### 2.    Merits

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[79]  The term "discriminate against a qualified individual on the basis of disability" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]."[80]

This type of ADA claim does not require evidence of discriminatory intent.[81]  Thus, a failure-to-accommodate claim is evaluated under a modified *McDonnell Douglas* burden-shifting framework.[82]  Under this framework, Plaintiff must first demonstrate a prima facie case comprising four elements: (1) she is disabled; (2) she was otherwise qualified; (3) she requested a plausibly reasonable accommodation; and (4) Defendant refused to accommodate her

---

[78] Doc. 40-16.

[79] 42 U.S.C. § 12112(a).

[80] *Id.* § 12112(b)(5)(A).

[81] *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017).

[82] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th Cir. 2018) (citing *Punt*, 862 F.3d at 1049–50).

disability.[83]  Plaintiff's burden to establish a prima facie case is not "onerous."[84]  If Plaintiff

establishes a prima facie case of failure to accommodate, the burden shifts to Defendant to "to

present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie

case or (2) establishing an affirmative defense, such as undue hardship or one of the other

affirmative defenses available to the employer."[85]  The Tenth Circuit has explained:

> If the employer does either of the above, summary judgment will
> be appropriate for the employer unless the employee then presents
> evidence establishing a genuine dispute regarding the affirmative
> defenses and/or rehabilitates any challenged elements of . . . her
> prima face case sufficiently to establish at least a genuine dispute
> of material fact as to such challenged elements.[86]

### a.        Access to Building Claim

Even if Plaintiff exhausted her claim based on failure to accommodate access to parking

and building facilities, she fails to establish a prima facie case.  There is no dispute that Plaintiff

is disabled and that she was otherwise qualified for the job.  Nor is there any dispute that she

requested a plausibly reasonable accommodation.  She requested automatic doors that would

give her access to the building and the building facilities such as the restroom.  She also

requested a parking space that was accessible to her given her mobility issues.

But Plaintiff has not shown that BPU refused to accommodate her disability.  Plaintiff

complained about the automatic doors malfunctioning and that BPU did not timely repair the

doors.  But BPU did not refuse to provide, repair, or maintain the automatic doors it installed.

Further, Plaintiff complained that from 2016 to 2020 she was repeatedly assigned inadequate

---

[83] *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020) (citations omitted).

[84] *Id.* (citing *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1266 (10th Cir. 2015)).

[85] *Id.* (quoting *Lincoln*, 900 F.3d at 1204).

[86] *Id.* (quoting *Punt*, 862 F.3d at 1050).

parking spaces.  Either the space was on an incline, too far from the building doors, subjected to ice, snow, and rain, or was assigned to another user who refused to give up their space to Plaintiff.  But the problem was never that BPU refused to accommodate Plaintiff.  It is undisputed that after being moved to five different parking spaces, this issue was resolved in 2020 when BPU assigned a parking space that provided the reasonable access that Plaintiff needed.   Plaintiff also complained that BPU failed to timely replace the dying battery on the motor scooter that BPU purchased for her, which caused her to miss several days of work.  But, again, this issue was resolved after a few days when BPU replaced the dead battery.

For this reason, Plaintiff fails to demonstrate the third prong of the prima facie test for failure to accommodate claims, that BPU refused to accommodate.  In fact, BPU has accommodated Plaintiff, by installing and repairing the automatic doors, moving her to various parking spaces in response to her complaints, and replacing the battery on the motorized scooter, though replacing it once it became dead rather than before the battery died.  For this reason, Plaintiff has failed to establish a prima facie case for failure to accommodate her requests for reasonable access to facilities.  Summary judgment is granted on the failure to accommodate access to parking and building facilities.

### b.    Indefinite Remote Work Claim

On the exhausted failure-to-accommodate claim based on Plaintiff's indefinite remote work arrangement request, there is no dispute that Plaintiff is disabled and that BPU refused to accommodate her request to work remotely for an indefinite period.  The second and third prongs of the prima facie test are disputed, which both address whether the requested accommodation was plausibly reasonable.

First, whether Plaintiff was otherwise qualified with or without reasonable accommodation is disputed.  Since Plaintiff is not claiming that she was qualified without a reasonable accommodation, she must prove that a reasonable accommodation would have enabled her to perform the essential functions of the job.[87]  And a reasonable accommodation means "those accommodations which presently, or in the near future, enable the employee to perform the essential functions of the job."[88]  What is reasonable depends "on the facts of each case taking into consideration the particular individual's disability and employment position."[89]

Whether a reasonable accommodation existed that would enable the employee to perform the essential functions of her job is a mixed question of law and fact.[90]  The Tenth Circuit prescribes a burden-shifting formula that first requires a plaintiff to show that the requested accommodation is reasonable on its face; it is not facially reasonable if the accommodation would not enable the employee to perform the essential functions of the job.[91]  If the plaintiff makes that showing, the burden shifts to the defendant to produce evidence of its inability to accommodate by showing special circumstances that prove an undue hardship in the particular situation.[92] If defendant meets this showing, the burden shifts to plaintiff to produce evidence of her individual capabilities and suggestions for a possible accommodation that rebuts defendant's evidence.[93]

---

[87] *See Aubrey*, 975 F.3d at 1006-07.

[88] *Id.*  (quoting *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1205 (10th Cir. 2018)).

[89] *Id.* (quoting *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017)).

[90] *Dansie v. Union Pac. R.R.*, 42 F.4th 1184, 1194 (10th Cir. 2022) (citation omitted)).

[91] *Id.*

[92] *Id.*

[93] *Id.*

Here, Plaintiff fails to show her requested accommodation of remote work for an indefinite period is a facially reasonable request.  BPU claims that Plaintiff's physical presence in the workplace is an essential function of the job.  And it has long been recognized that in many or most workplaces, physical presence is an essential function of the job.  For example, the Tenth Circuit explained in *Mason v. Avaya Communications, Inc.*[94] that physical attendance in the workplace is an essential function of most jobs, such that an employee's request to work from home is unreasonable as a matter of law if the employer has determined that physical presence in the workplace is an essential function of that position.[95]  Courts generally defer to the employer's judgment as to what functions are essential, and in that case deferred to the employer's judgment that the plaintiff's position as a service coordinator required her physical presence because the position required teamwork as well as the ability to supervise the employee's work in the workplace.[96]  Other circuits have similarly recognized that physical presence in the workplace is an essential function of most jobs.[97]

BPU argues that physical presence is an essential function of Plaintiff's position as Assistant Purchasing Agent, and indeed, of all of its positions.  BPU provides critical infrastructure and services to the population of Wyandotte County, Kansas—it supplies water and electricity to the county and metropolis of Kansas City, Kansas.  With the exception of a three-week period at the beginning of COVID, or when an employee needed to quarantine, BPU

---

[94] 357 F.3d 1114, 1119 (10th Cir. 2004).

[95] *Id.* (citation omitted) (deferring to the employer's description of the job and functions required to perform that job).

[96] *Id.* (collecting cases).

[97] *See, e.g.*, *Hypes v. First Com. Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (finding loan analyst's position required physical presence because position required teamwork); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995) ("Most jobs in organizations public or private involve team work under supervision rather than solitary unsupervised work, and team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance.").

generally has required all of its employees to work in the workplace. BPU allowed Plaintiff to work remotely during the month of February 2021, as an accommodation. And, according to Plaintiff, she is aware of a cancer patient that was allowed to work remotely for more than a month, but could provide no further details and none of the BPU witnesses recalled any employee being allowed to work remotely except temporarily, for a limited, defined period.

Furthermore, BPU has shown that the Assistant Purchasing Agent worked under the supervision of the Director of Purchasing, and that the position required interaction and communication with stores, accounting, salespersons and engineering departments. Plaintiff was responsible for procurement, contract negotiations and purchasing for one storeroom, a physical space at BPU. HR Director Dumovich and Director of Purchasing Aldinger both stated that physical presence was required for all positions in the Purchasing Department, including the Director and the Assistant Purchasing Agent. Aldinger specifically stated that when she interviewed for the Director of Purchasing position she understood that physical presence was required and that when she interviews people for other positions in the purchasing department she ensures they understand that physical presence is required. Aldinger further stated that it would be highly difficult for her to perform her job as Director if she worked remotely every day; and that it would be highly difficult for the Purchasing Department to function if the Assistant Purchasing Agent worked remotely every day.

BPU has further shown that it had a particularized need to have Plaintiff present to assist with onboarding, training, and/or acclimating Aldinger, the newly hired Director of Purchasing and Supply Chain. Moreover, during Plaintiff's tenure as Acting Director, and as BPU transitioned to a new Director, Austin was taking measures to improve the processes of the Purchasing Department, including supervising and overseeing the contract reviews performed by

Plaintiff and others, to push the Purchasing Department to engage in more substantive reviews of contracts.  All of this demonstrates BPU's need for Plaintiff to be physically present in the workplace and demonstrates the importance of the Tenth Circuit's direction that courts not second guess the employer's judgment as to what the essential functions of a job are, particularly when its description of the essential functions is uniformly enforced and consistent with business necessity.[98]

Plaintiff argues that she worked remotely in February 2021, which demonstrates that physical presence is not an essential function of the job.  But this argument fails for two reasons.  First, an employee cannot create a genuine, material issue of fact based solely on her opinion of what the essential functions of the job are.[99]  Nor does Plaintiff's reliance upon the written job description create a material issue of fact.  Although neither the job description for the Assistant Purchasing Agent nor the job description for Director of Purchasing and Supply Chain expressly state that physical presence is required, that is not dispositive of whether physical presence is an essential function of either position.[100]

Second, since Plaintiff was requesting to work remotely for an indefinite period of time, she cannot show that is a facially reasonable accommodation, given that a reasonable accommodation is one that will enable the employee to perform the essential functions of the job either presently in the near future.[101]  But her requested accommodation would not enable her to work in the workplace either presently or in the near future.  Neither she nor her medical provider offered any expected duration of her need to work remotely.  As the Tenth Circuit

---

[98] *Mason*, 357 F.3d at 1119 (citation omitted).

[99] *Id.* at 1121.

[100] *Id*. at 1121–22.

[101] *See Freeman v. City of Cheyenne*, No. 23-8022, 2024 WL 464069, at *7 (10th Cir. 2024) (concluding that where physical attendance is an essential function, remote work is not a reasonable accommodation).

explained, "[w]ithout an expected duration of an impairment, an employer cannot determine whether an employee will be able to perform the essential functions of the job in the near future and therefore whether the leave request is a 'reasonable accommodation.'"[102]

In contrast, BPU granted Plaintiff's request to work from home for a few weeks before and after her chemotherapy treatment in February 2021.  That was for a limited period of time with a defined duration.  But in March 2021, when Plaintiff requested to work remotely indefinitely, she provided no expected duration nor any insight into when and under what circumstances she could return to work in the workplace, given the COVID pandemic.[103]  The March 25, 2021 note from her medical provider shed no light on this either, merely advising that Plaintiff would return to work at this time for an indefinite period.  BPU interpreted that to mean Plaintiff would not work at all, a reasonable interpretation given that Plaintiff was not working at all at the time the note was sent.  But even if BPU interpreted or should have interpreted the note to mean that Plaintiff would not return to work in the workplace, the note still provided no expected duration or explanation of under what conditions or circumstances she could return to the workplace in lieu of working remotely.[104]

In short, Plaintiff has failed to demonstrate a prima facie case for her claim of failure to accommodate an indefinite period of remote work, because she has failed to show that it was a

---

[102] *Aubrey v. Koppes*, 975 F.3d 995, 1011 (10th Cir. 2020) (10th Cir. 2020) (citations omitted).

[103] *See Taylor v. Pepsi-Cola Co.*, 196 F.3d 1106, 1110 (10th Cir. 1999) (concluding that keeping plaintiff on indefinite leave or for an excessive amount of time is not a reasonable accommodation for an employee who told employer that he could not advise when and under what conditions he could return to work. (citation omitted)).

[104] Plaintiff does not argue that BPU failed to engage in the interactive employee-employer process required when an employee requests an accommodation.  But even if BPU was obliged to inquire further of Plaintiff, because Plaintiff has neither asked for nor shown any accommodation other than working remotely for an indefinite period, Plaintiff is not entitled to recovery because she cannot show a reasonable accommodation was possible. *See Smith v. Midland Brake, Inc.*, 180 F3d 1154, 1174 (10th Cir.1999) (citation omitted) (explaining that even if employer failed to fulfill its interactive obligation, employee not entitled to recovery unless he can show that a reasonable accommodation was possible)).

facially reasonable accommodation.  Even if it were a facially reasonable request, BPU has
produced evidence of its inability to accommodate such a request without undue hardship given
the nature of its business, and in particular, given the operations and business needs in the
Purchasing Department.  Thus, under the *Dansie* burden-shifting framework, the burden would
shift to Plaintiff to produce evidence of her individual capabilities and for suggestions for
possible accommodations to rebut BPU's showing.[105]  Plaintiff has produced no such evidence.
In fact, a year later, in March 2022, Plaintiff's medical provider drafted another note suggesting
Plaintiff be accommodated then with an indefinite period of remote work.  Accordingly,
summary judgment is granted on Plaintiff's claim of failure to accommodate remote work.

### C.      Discrimination

#### 1.      Administrative Exhaustion

Plaintiff claims that BPU discriminated against her based on her disability by failing to
promote her to the Purchasing Director position she applied for in 2021.  Although BPU argues
that this claim was not administratively exhausted, the Court finds that the original charge filed on
November 22, 2021, provided adequate notice for exhaustion purposes.  The original Charge
detailed how Plaintiff worked as Acting Purchasing Director for three years, was not hired, and
was required to train the person who was hired.  The Charge expressly states: "I believe I have
been discriminated, overlooked for a promotion and forced out on LTD into early retirement
because of my disability."[106]  The Charge provides sufficient notice to trigger an EEOC
investigation into BPU's failure to promote Plaintiff.  Additionally, Plaintiff learned that she was

---

[105] *See Dansie v. Union Pac. R.R.*, 42 F.4th at 1184, 1194 (10th Cir. 2022).

[106] Doc. 40-16.

not hired on or about March 2, 2021, well within the 300-day lookback period before November 22, 2021.  The failure-to-promote claim was administratively exhausted.

>           2.      **Merits**

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability."[107]  Plaintiff does not rely on direct evidence that she was discriminated against. Thus, the Court considers her claims under the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*.[108]

>           a.      **Prima Facie Case**

Under *McDonnell Douglas*, the plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[109]  To establish a prima facie case of failure-to-hire or failure-to-promote discrimination under the ADA, Plaintiff must show: "(1) that she is disabled within the meaning of the ADA; (2) that she is qualified for the job held or desired; and (3) that she was discriminated against because of her disability."[110]  "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee."[111]  The court does not look to the plaintiff's subjective evaluation of the situation.[112]

There is no dispute that Plaintiff is disabled within the meaning of the ADA.  Nor is there any genuine dispute that she met the minimal qualifications for the position she applied for— Director of Purchasing and Supply Chain.  Plaintiff served as Acting Purchasing Director from

---

[107] 42 U.S.C. § 12112(a).

[108] 411 U.S. 792 (1973); s*ee Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1192 (10th Cir. 2018).

[109] 411 U.S. at 802.

[110] *Aubrey v. Koppes*, 975 F.3d 995, 1014 (10th Cir. 2020) (alterations omitted) (quoting *Lincoln*, 900 F.3d at 1192).

[111] *Tesh v. U.S. Postal Serv.*, 349 F.3d 1270, 1272 (10th Cir. 2003) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

[112] *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1044 (10th Cir. 2011).

2017 to 2021 and during those four years, received performance evaluations from Austin stating that she met expectations.  Indeed, Austin encouraged Plaintiff to apply for the position, and Austin and Dumovich interviewed Plaintiff despite the outside consultant not recommending her for interview.  While Plaintiff and BPU dispute whether physical presence in the workplace was an essential function of the Director of Purchasing position, it is important to note that Plaintiff interviewed for the position in January 2021, at a time when she was working in the workplace. She began working remotely later, during the month of February, an accommodation she requested and BPU granted.

With respect to the third prong of the prima facie case, Plaintiff must show that she was not promoted because of her disability.[113]  This element of the prima facie case "requires the plaintiff to present some affirmative evidence that disability was *a determining factor* in the employer's decision."[114]  The third prong of the prima facie test "focuses on whether the circumstances surrounding the adverse employment action 'give rise to an inference that the [action] was based on [the plaintiff's] disability.'"[115]  Additionally, courts have identified many circumstances that may lead to an inference of discrimination, including:

> [A]ctions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus . . . , preferential treatment given to employees outside the protected class . . . , in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees . . . , or a pattern of recommending the plaintiff for positions for which she is not qualified [or over-qualified] and failure to surface plaintiff's name for positions for which she is well-qualified.  A plaintiff might also rely upon the fact that the defendant, following plaintiff's termination, continued to seek applicants to fill the position, . . . or,

---

[113] *See id.* at 1038 (quoting *Mathews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)).

[114] *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)(emphasis in original).

[115] *Id.* at 1192–93 (quoting *Smothers v. Solvay Chems., Inc*., 740 F.3d 530, 544 (10th Cir. 2014)).

more generally, upon the timing or sequence of events leading to plaintiff's termination.[116]

BPU made its decision to hire Aldinger sometime before February 18; Plaintiff testified that she was informed of this before her chemotherapy treatment on February 18.  At this time Plaintiff was working remotely from home.  This timeline suggests that the question of Plaintiff's physical presence in the workplace could have factored into the decision; her working remotely during the month of February could have been a determining factor in her not getting promoted.  In other words, these circumstances give rise to an inference that the failure to promote Plaintiff was based on her MS and immunocompromised state. The burden of establishing the prima facie case is "not onerous."[117]  Plaintiff has established the light burden of showing that her disability was a determining factor in her not being promoted or hired as Director of Purchasing, in that she began working remotely after she interviewed for the position but before the hiring decision was made.

### b.    Defendant's Reason for the Decision

Because Plaintiff has established a prima facie case of discrimination, the burden shifts to Defendant to articulate a facially nondiscriminatory reason for its actions.[118]  This burden is also not onerous.[119]  BPU articulates a legitimate nondiscriminatory reason here: Aldinger had superior qualifications and more experience than Plaintiff.  Aldinger had a long career in supply chain and procurement with other utilities and electricity companies, and had managed all procurement-related activities for contracts for power delivery and power generation projects,

---

[116] *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (quoting *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 91 (2d Cir. 1996)).

[117] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[118] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[119] *Dewitt v. S.W. Bell Tele. Co.*, 41 F. Supp. 3d 1012, 1018 (D. Kan. 2014) (citing *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999)).

similar to projects that BPU engaged in.  And Aldinger had negotiated contracts, including construction contracts.  While Plaintiff met the minimal qualifications of Acting Purchasing Director, she had less involvement in negotiating or reviewing contracts.  In fact, based on BPU's records, between August 13, 2019 and March 4, 2021, when Plaintiff served as Acting Purchasing Director, Plaintiff spent less than one minute reviewing 29% of the relevant contracts, and less than five minutes reviewing 36.4% of contracts, suggesting that Plaintiff was not engaged in the kind of substantive review of contracts BPU was looking for in its candidates. Moreover, BPU had been experiencing tremendous problems with sourcing wire, cable and electric transformers during the COVID 18 pandemic.  Aldinger had experience with outside vendors and a supply chain beyond BPU's.  Aldinger also had a master's degree, a preferred qualification that Plaintiff lacked.  Thus, despite Plaintiff having served as Acting Purchasing Director for four years, Aldinger's qualifications and experience were superior.

### c.      Pretext

Given BPU's articulation of a legitimate nondiscriminatory reason for not hiring Plaintiff, the burden shifts back to Plaintiff to present evidence from which a jury might conclude that Defendant's proffered reason is pretextual, that is, "unworthy of belief."[120]  "[A] plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are 'so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [they are] unworthy of belief.'"[121]  Although the burdens of production shift, the

---

[120] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[121] *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010) (second alteration in original) (quoting *Hinds v. Sprint/ United Mgmt. Co.*, 523 F.3d 1187, 1197 (10th Cir. 2008)).

ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.[122]

Typically, a plaintiff attempts to demonstrate pretext in one or more of three ways:

> (1) "[E]vidence that the defendant's stated reason for the adverse employment action was false"; (2) "evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances"; or (3) "evidence that the defendant acted contrary to an unwritten policy or contrary to [the employer's] practice when making the adverse employment decision affecting the plaintiff."[123]

Plaintiff attempts to demonstrate pretext first by pointing to BPU's use of an outside agency to assist in hiring the Director of Purchasing and Supply Chain.  Plaintiff argues that BPU did not use outside agencies for hiring and use of an outside agency in this instance was intended to mask BPU's intention to not hire her.  But there is evidence that BPU *had* used agencies to assist it with searches for high-level professional positions such as the Director of Purchasing.  And Plaintiff offers no evidence that BPU acted contrary to a company policy or practice in engaging an outside agency.

Plaintiff also points to the temporal closeness of her medical provider's February 11, 2021 note to BPU and her not being hired for the position in late February or early March.  The February 11, 2021 note, which Plaintiff transmitted to HR employee Dustin Swartz on February 17, read "I have been instructed by my doctor to work from home."  This note was in the context of Plaintiff having a scheduled chemotherapy session on February 18.  The February 11 note said nothing about the duration of her working from home, nor did it give any indication that she was

---

[122] *Id.*

[123] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (second alteration in original) (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

or would be asking to work remotely indefinitely.  In fact, BPU's actions belie any understanding or notice that Plaintiff intended to request an indefinite period of remote work in March.  In early March, BPU asked when Plaintiff would be returning to work in the office, so it could coordinate a start date for Aldinger. And while Plaintiff asserts that Austin's request for a doctor's note clearing her to return to the office is suspect, there is no evidence from which such an inference could be drawn.  Plaintiff points out that BPU had never requested she produce such a doctor's note.  But BPU's response is not suspicious, given the February 11 doctor's note, which referenced Plaintiff's increased risk of infection especially during the COVID-19 pandemic situation.

Before COVID-19, BPU had routinely allowed Plaintiff one week of leave after her biannual chemotherapy sessions.  And in the summer of 2020, after the onset of the pandemic, BPU had allowed Plaintiff to take three to four weeks off around the time of her chemotherapy session.  In February 2021, BPU had granted Plaintiff's request to work from home for several weeks before and after her February 18 chemotherapy session.  BPU's prior practice of giving Plaintiff time off around her chemotherapy treatments, and its later approval of her request to work remotely (rather than take off) around the time of her chemotherapy treatment raises no inference that BPU failed to promote her because she had requested and received permission to work remotely for several weeks before and after her February 18 treatment.

Moreover, Plaintiff offers nothing to rebut BPU's stated reason that Aldinger had stronger qualifications and experience.  While Plaintiff may have had some experience in direct negotiation of some contracts, and may have met the qualifications for the position, that does not mean that BPU necessarily discriminated against her in hiring Aldinger, who had significantly more relevant job experience.  BPU, for example, wanted its purchasing department to be more

directly involved in substantive contract reviews and contract negotiations; Aldinger's

experience exceeded Plaintiff's experience in both realms.

In fact, Plaintiff offers no argument or evidence that her qualifications were even

equivalent to Aldinger and as the Tenth Circuit has explained:

> [A]n important distinction exists between minimum
> qualifications—those that are absolutely mandatory to be eligible
> for a position—and other positive attributes that set competing
> candidates apart.  The former are relevant at the first stage of the
> *McDonnell Douglas* analysis; a candidate that is not minimally
> qualified fails to make out a prima facie case of discrimination.
> But the latter may legitimately be used to differentiate between
> minimally qualified candidates; a candidate may be minimally
> qualified, yet lack the skill set and experience other candidates
> offer. . . .[124]

Thus, "to suggest that an employer's claim that it hired someone else because of superior

qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held

belief, a plaintiff must come forward with facts showing an 'overwhelming' 'disparity in

qualifications.'"[125]  The Court must examine "the facts as they appear to the person making the

decision," not the plaintiff's subjective belief.[126]

In sum, Plaintiff has failed to show that BPU's stated legitimate, non-discriminatory

business reason for not promoting her is false, incoherent, weak, or unworthy of credence.  In the

absence of such evidence, it is not this Court's prerogative to second-guess BPU's judgment.

"The reason for this rule is plain: our role is to prevent intentional discriminatory hiring

practices, not to act as a 'super personnel department,' second guessing employers' honestly held

---

[124] *Doyle v. Nordam Grp., Inc*., 492 F. App'x 846, 851 (10th Cir. 2012).

[125] *Johnson*, 594 F.3d at 1211 (quoting *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1309 (10th Cir. 2005)); *see Hamilton v. Okla. City Univ*., 563 F. App'x 597, 602 (10th Cir. 2014) (noting that courts should only "draw an inference of pretext where the facts assure [it] that the plaintiff is better qualified than the other candidates for the position." (quoting *Santana v. City & Cnty. of Denver*, 488 F.3d 860, 865 (10th Cir. 2007))).

[126] *E.E.O.C. v. C.R. England, Inc*., 644 F.3d 1028, 1044 (10th Cir. 2011).

(even if erroneous) business judgments."[127]  Summary judgment is granted to BPU on Plaintiff's claim of discrimination in failing to promote her.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 39) is **GRANTED.**  The Clerk is directed to enter judgment in favor of Defendant Unified Government of Wyandotte County/Kansas City, Kansas, as representative of the Kansas City Board of Public Utilities.

**IT IS SO ORDERED.**

Dated: October 17, 2024

> S/ Julie A. Robinson
> JULIE A. ROBINSON
> UNITED STATES DISTRICT JUDGE

---

[127] *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).